KIECKHEFER BOX COMPANY, Respondent, vs. JOHN STRANGE PAPER COMPANY, Appellant.

*June 13—July 8, 1922.*
*February 10—April 3, 1923.*

*Sales: Instalment contracts: Severable breach: When material: How determined: Remedies of injured party: Termination of contract: Rehearing: Effect of order for rehearing on original judgment.*

1. Hereafter, when a motion for a rehearing is granted, the mandate upon the rehearing should declare whether the original judgment is affirmed, set aside and vacated, or modified.
2. Ordinarily in mercantile contracts time is of the essence of the contract, and agreements in relation thereto are to be regarded as a warranty or condition precedent, and upon failure or nonperformance thereof the aggrieved party may repudiate the entire contract; but the tendency is to relax the strictness of this rule.
3. Where the language of a statute is plain and unambiguous it is not subject to construction and is to be enforced and applied in accordance with its terms. Construction of a statute can be resorted to only when there is real uncertainty as to the meaning and intent of the legislative declaration.
4. By sec. 1684t—45, Stats., it is made a question of fact in each case whether or not, taking into consideration the terms of the contract to sell and deliver goods on instalments and the

circumstances in the case, the breach as to a single instalment is so material as to justify the opposite party in refusing to further perform and to sue for damages for breach of the entire contract, or whether the breach is severable, giving rise to a claim for damages but not justifying the injured party in treating the whole contract as broken.

5. Where the failure to perform as to one instalment is coupled with conduct or a declaration amounting to a repudiation, it constitutes a material breach as a matter of law.

6. To determine whether or not there is a material breach in a given case, where there is no evidence of abandonment or repudiation, requires a determination as to a matter of fact, and the result in each case must depend upon the facts and circumstances when considered in connection with the terms of the contract in each case.

7. In an action to recover damages for breach of a contract wherein defendant agreed to erect a paper mill and deliver to plaintiff its entire output of paper board for a term of years, it is *held*, taking into consideration the terms of the contract and the circumstances of the case (set forth in the opinion), that a breach of the contract occasioned by a postponement of the time of the first delivery of paper board was not such a material breach of the contract as justified the plaintiff in refusing to proceed further, and did not give it a right of action for damages.

APPEALS from a judgment of the circuit court for Winnebago county: BYRON B. PARK, Circuit Judge. *Reversed.*

The appeals are from an interlocutory judgment entered upon the stipulation of the parties in an action for damages for breach of contract.

This is an action upon contract involving the building of a paper mill and the output thereof for a term of four years. The evidence is voluminous, and in view of the conclusions of the court we deem it unnecessary to extend the statement of facts or to discuss the issues in our opinion. The case comes to us for construction of the terms of the contract and the proper method of assessing damages.

For the plaintiff there were briefs by *Austin, Fehr, Mueller & Gehrz,* attorneys, and *James D. Shaw,* of counsel, all of Milwaukee, and oral argument by *Mr. Shaw* and *Mr. Arthur A. Mueller.*

For the defendant there were briefs by *Silas Bullard* of Menasha, *Bouck, Hilton, Kluwin & Dempsey* of Oshkosh, and *Hoyt, Bender & McIntyre* of Milwaukee, and oral argument by *Walter H. Bender, Frank M. Hoyt,* and *John F. Kluwin.*

The following opinion was filed July 8, 1922:

CROWNHART, J. This case involves some 1,100 pages of testimony and numerous exhibits. The trial court made its findings of fact and conclusions of law, and from those findings and conclusions both parties appeal.

We have examined the evidence with care, and have been aided by the elaborate briefs and arguments of counsel. We shall state our conclusions briefly.

The following findings of fact, Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10, are based upon sufficient credible evidence and are sustained.

Finding No. 11 is also sustained for the same reason. It is plain that the letter claimed to be a rescission of the contract must be construed "in line with communications heretofore sent," and that the term "rescind" as used in such communication, when so considered in line with the communications theretofore sent, plainly expressed the intention, which was understood by both parties, that the plaintiff elected to terminate performance under the contract and claim damages for the breach thereof.

Finding No. 12 we construe to be a conclusion of law as to an interpretation of one of the provisions of the contract. On this question the court is evenly divided, three members holding that the contract provision that the average conversion cost shall not exceed $10 per ton is to be construed as an absolute limitation, and three members of the court holding that the term is modified by other language in the contract with reference to profits, and is to be construed as determined by the trial court. This makes necessary the affirmance of the finding of the trial court under the rule.

The findings of the trial court all being sustained, its conclusions are also sustained. As we interpret the findings and conclusions, it was the duty of the plaintiff to minimize the damages by reason of the breach, and that the defendant shall be given credit accordingly as determined by the trial court.

*By the Court.*—The findings of fact and conclusions of law and judgment of the trial court are affirmed.

DOERFLER, J., took no part.

The following opinion was filed April 3, 1923:

In the original opinion filed in this case (*ante*, p. 369, 189 N. W. 145) it was held that there was no rescission of the contract, and the decision of the trial court as to the interpretation of that clause of the contract relating to conversion cost was sustained by reason of the fact that this court was equally divided upon that question.

Both parties moved for a rehearing. Motions for rehearing were granted, the entire case was fully and exhaustively reargued and has been reconsidered by the court. Many important questions were ably and exhaustively argued, and for that reason, if for no other, merit discussion in this opinion. Upon some of these questions, however, the court is divided, and as the conclusion which the court has reached is sustained without passing upon other questions presented, we shall limit our discussion to that aspect of the case determinative of the issues involved. A division of the court is due to the fact that Mr. Justice DOERFLER, having been of counsel, was disqualified from participating in the case.

In order to present the question upon which the court rests its decision, it will be necessary more fully to state the

Kieckhefer Box Co. v. John Strange Paper Co. 180 Wis. 367.

facts than was done when the decision of the court was first handed down.

### Statement of facts.

Plaintiff is a Wisconsin corporation, engaged in the manufacture of paper-board boxes at Milwaukee, Wisconsin, and used in its business large quantities of several classes of paper board. The defendant is a Wisconsin corporation, owner of a paper-mill plant located on the Fox river at Menasha, Wisconsin, and engaged in the business of manufacturing paper board. For a number of years prior to the making of the contract in question the defendant had manufactured for the plaintiff and the plaintiff had purchased from the defendant quantities of paper board under various contracts, one of which was to expire on July 1, 1917. In May, 1916, the matter of making a new contract was under discussion and the idea of building and constructing a new mill, which should be designed to manufacture a paper board of a width especially adapted to plaintiff's needs, the erection of additional warehouses in which to store raw materials, and the sale of the entire output of the new machine to plaintiff, was under consideration. The advantages to be derived from such an arrangement were mutual—the plaintiff would have a dependable source of paper board at contract prices and thus be relieved from the burden of purchasing such paper in the open market from miscellaneous producers and would not be obliged to own and operate a paper mill; the defendant would have a responsible customer for the entire output of the new machine at prices which would yield a profit. It became apparent that the execution of such an arrangement would involve an initial outlay on the part of the defendant of a sum amounting to $300,000 or upwards. It is the claim of the defendant that the plaintiff promised that it would take and place at least $150,000 of a proposed bond issue, which was to provide the money for

the erection of the mill and warehouses with their appurtenances. The negotiations of the parties resulted in a contract [1] (printed in the margin), dated June 29, 1916. It may

---

[1] AGREEMENT made and entered into this 29th day of June, A. D. 1916, by and between the *John Strange Paper Company,* party of the first part, and the *Kieckhefer Box Company,* party of the second part, both being Wisconsin corporations, witnesseth:

1. First party agrees to install, and at all times during the term of this contract to maintain, in its plant in Menasha, Wisconsin, a six-cylinder paper machine to trim 130″, and all such supplementary machinery and equipment of the latest and most efficient design as may be required to at all of said times enable said first party to produce and furnish to second party at lowest possible cost the paper board hereinafter mentioned. And all the buildings required for the handling and storage of raw material or of finished board for the second party, shall be so constructed, equipped, and maintained that the same will serve to attain said lowest possible cost. Said first party agrees to manufacture, sell, and load on cars and bill to second party *at places designated by the latter* from time to time, and second party agrees to purchase and accept from said first party, during each and every month throughout the continuance of this contract, *commencing July first, 1917,* and until the termination of this contract, *the entire output* of said machine, to consist of Plain Chip Board, Container Liner, and Test Chip-Board, of the quality and kind and according to the specifications, and at the prices and terms, hereinafter set forth. Second party agrees that not less than thirty-five per cent of the finished board taken out on this contract shall be Plain Chip Board.

2. All finished board shall be at least equal in character, quality, workmanship and finish to samples which are marked 'Sample 1,' 'Sample 2,' and 'Sample 3,' and identified with the initials of the parties hereto.

3. Second party shall furnish to first party the widest trim that second party can conveniently give, the same to be from 123″ to 130″.

4. The thickness of Plain Chip Board shall be not less than .019 in any instance, and average thickness of all Plain Chip Board shall be not less than .022, but a variation of thickness of not to exceed .001 above or below the thickness stated in specifications or orders given by second party shall be permitted. The thickness of Container Liner and Test Chip Board shall be .016, with a variation of not to exceed .001 above or below said thickness permitted.

5. All weights hereinafter fixed are upon the basis of 1,000 square feet, and the average weights allowed are as follows: 67# for .019 Plain Chip Board; 87# for .025 Plain Chip Board, and weights for intermediate thicknesses are to be fixed proportionately. The average weight allowed for Container Liner and Test Chip Board is to be 68#. All such weights to be determined in the manner following: One sample of exactly one square foot shall be

be briefly summarized as follows: the defendant was obligated to erect a mill and install therein a new paper machine, trim 130 inches, together with all supplementary machinery and equipment designed to furnish paper board of the specified classes, at the lowest possible cost. The defendant agreed to furnish and plaintiff agreed to purchase, beginning

---

taken from one side of each roll in the car and the total weight of the samples shall form the basis of arriving at the weight per 1,000 square feet. The average weight per 1,000 square feet for each grade of board furnished second party under this contract shall be determined in the above manner on each successive one hundred tons of each grade furnished, and the average weight so determined shall not exceed the average weight herein specified.

6. The diameter of rolls, unless otherwise agreed upon, shall be 44″ on .019 Plain Chip Board and .016 Container Liner and Test Chip Board up to 49½″ wide, and shall be 55″ in diameter on all .025 Plain Chip, as well as on .019 Plain Chip Board, .016 Container Liner and .016 Test Chip Board over 49½″ wide.

7. First party shall securely paste and flag all breaks in rolls, and shall adequately paste the paper at the end of the rolls to prevent waste in their handling.

8. All rolls shall be tightly and evenly wound on round wooden cores with a square center opening two and three-fourths inches square, said core stock suitable in quality and quantity, or made cores, shall be furnished by second party at cost, and cores are to be billed at like price to second party when returned in rolls of finished board.

9. All rolls shall be loaded single tier, and in no case set on end, and same shall be well blocked in cars to prevent shifting while in transit.

10. First party agrees to produce an average of one ton of 2,000# of finished board not to exceed 2,200# air dry weight of raw material, said raw material to be clean stock and suitable for the manufacture of such grades of board as this contract provides for. The proportions of the various materials entering into the manufacture of all grades of board made under this contract shall be subject to the approval of the party of the second part, but said approval must be consistent with interests of both parties in producing all boards to the best advantage, and in harmony with the spirit of this contract.

11. Party of the second part has the first privilege of buying all raw materials, including mixed papers, news, sulphite, kraft, and the like, and also color, sizing, starch, alum, and the like, all of which shall be clean stock and suitable for the manufacture of such grades of board as provided for in this contract, and said second party is herein bound to maintain a sufficient quantity of said clean raw materials required to insure the continuous operation of the

'July 1, 1917, the entire output of this new machine, manufacturing board of the classes ordered by written specifications, which plaintiff agreed to furnish on Friday of each week. The plaintiff reserved the right to furnish the raw materials needed for the board, but with the proviso that if it failed to keep the defendant supplied so that the mill

---

mill of the first party to its maximum capacity; and if second party does not maintain stock in sufficient quantities and suitable quality at the mill of the first party, then the first party is herein authorized to purchase, at the best market rates, sufficient quantities of clean raw materials, and the prices paid shall be treated in the same manner as though the purchase were made by the party of the second part. In furnishing raw materials of all kinds, second party shall supply to first party under this contract only such grades and quantities of raw material as shall be suitable and necessary to make the grades of board to be taken under this contract by party of the second part, and no accumulation of other kinds or grades of raw material shall be allowable. All raw materials purchased by second party and shipped to first party for manufacture of board under this contract shall be invoiced to first party by second party at air dry weights, with freight charges on such shipments allowed to Menasha, Wisconsin, at current market prices, and said first party shall from time to time carry on hand and pay for up to five thousand (5,000) tons of 2,000# each, of such raw material, and provide all needed storage room therefor. And such first party shall by all means possible, and to the utmost of its ability, aid second party in securing or purchasing said raw material at the best prices and terms obtainable, whenever requested to do so by second party. First party herein agrees that it will, until six (6) months after notice to the contrary from second party, supply and use under this contract all Chrysoidine to which it may be entitled during the term hereof from the National Aniline & Chemical Company, Milwaukee, Wisconsin, under and by virtue of its contract with the latter numbered 2402, at the same price as stipulated in said contract. First party also agrees that second party is to receive for use in making the grade of board specified in this contract all alum for which first party is now under contract in excess of the amounts needed by first party for the manufacture of paper other than those grades specified in this contract.

12. All finished board shall be billed by first party to second party at actual cost,—said cost to be comprised of the actual cost of all raw materials used, plus the conversion cost as hereinafter defined, plus freight on finished board, together with a profit to the said first party of $3 per ton upon Plain Chip Board, $4 per ton upon 75# Test Chip Board and 75# Test Liner, and $5 per ton upon 85# and 100# Test Liner, and together with an additional profit to said first party of twenty-five cents per ton of any

could be run to its capacity, the defendant might purchase on the market the additional raw materials required. The plaintiff also reserved the right to approve the proportion of raw material entering into the board manufactured under the contract. All board manufactured was to be billed plaintiff by defendant at "actual cost, together with a profit"

---

of said board should the total amount manufactured and shipped under this contract be less than 15,000 tons during any year.

And said first party agrees that it will to the utmost of its ability operate said mill so as to produce the maximum capacity of said paper machine in making the grades of board called for by this contract.

13. The average conversion cost per ton of 2,000# of finished board shall not exceed $10 per ton and is to consist of the following items and amounts:

| | | |
|---|---|---|
| Interest | $15,000 | per annum |
| Insurance | 750 | per annum |
| Office | 1,800 | per annum |
| Depreciation | 12,500 | per annum |
| Taxes | 4,500 | per annum |
| Supplies | 1,500 | per annum |
| Incidentals | 3,400 | per annum |

Belting and packing, wire, oil, demurrage and repairs at actual costs, the total of such cost of said items not to exceed $13,300 per annum.

Felts, coal, electric power and labor at actual costs, on which costs second party is to be consulted with the view of minimizing said costs.

Labor shall include only actual time at fair rates for work required in the performance of this contract of mill employees including superintendents, the same to be kept separately, and shall not extend to office help, officials, and others directing the general management of said mill.

Actual conversion cost shall be computed quarterly on the first days of January, April, July, and October in each year, commencing October first, 1917. Invoices for finished board to be based on such cost for the preceding quarter, but proper credit and payment to be made by either party to the other, according to the actual cost determined on the first day of the following quarter. The board shipped by party of the first part to party of the second part during the first three months of this contract shall be billed to second party by first party with a base conversion cost of $10 per ton of 2,000#, and proper adjustment shall be made at the end of said three months, figured on actual conversion cost during said period.

14. Terms are thirty days net on all finished board shipped to second party, and also on all raw materials shipped by the latter to first party.

running from $3 to $5 per ton, depending upon the character of the paper, with provision for an additional profit of twenty-five cents per ton should the total amount manufactured and shipped under the contract be less than 15,000 tons during any year. "Actual cost" was defined by the contract and was to consist of the cost of the raw materials plus cost to convert them into board plus freight. Conversion cost was not to exceed $10 per ton and several items of the conversion cost were specified, such as interest, depreciation, insurance, taxes, office expense, supplies, and incidentals. A method was provided for computing the actual conversion cost and the time as of which it should be computed. The contract provided that it should remain in force until

15. Second party shall furnish weekly specifications to first party on Friday of each week for the entire output for the following week, and first party agrees to diligently manufacture and deliver in accordance with this contract, its entire output, promptly as manufactured.

16. All buildings of first party hereinbefore referred to shall be equipped with automatic fire sprinklers and shall be so constructed that the cost of insurance will be minimized as far as possible.

17. Second party shall have the right, at its option, to substitute in the requirements under this contract for the paper board herein specifically mentioned, other paper board for the manufacture of which the machinery and equipment above mentioned may be adaptable, all provisions of this contract as to costs and other particulars to apply thereto, excepting only that the fixed profits and conversion cost per ton of 2,000# to which first party shall be entitled as provided in paragraph 12 hereof, shall be increased or diminished according to the daily tonnage of such substitute board as compared with that of Plain Chip Board. In case second party desires to substitute in the requirements different grades of board than provided for in this contract, said second party agrees to furnish specifications and accept from first party such board as is provided for in this contract, to the amount as can be made from the raw materials then on hand or in transit, unless such raw materials as are on hand or in transit are suited to the manufacture of the substituted board.

18. Each party shall be allowed free and unhindered access to, and inspection of all books, records, invoices or other papers bearing upon the determination of actual costs or other amounts herein agreed upon, and second party shall be allowed such access to all buildings of first party affected by this contract.

19. This contract shall continue in force until the expiration of

Kieckhefer Box Co. v. John Strange Paper Co. 180 Wis. 367.

terminated by either party on twelve months' written notice, but it could not be thus terminated prior to July 1, 1921. The contract also contained the following clause:

"Times of performance by either party shall be extended upon written request, for wars, strikes, fires, floods, accidents, shortage of raw materials, or other causes beyond the control of the party delayed, but not for a longer time than the actual period of continuance of such causes of delay."

Upon the signing of the contract the defendant at once entered upon its performance. Within a day or two it placed an order for a paper machine to cost $125,000. It hired an engineer, started surveying and making other preparations to erect the mill. On July 18, 1916, the defendant wrote the plaintiff in reference to the matter of its taking and disposing of one half of the proposed bond issue and asked for the advancement of funds. The plaintiff refused the advancement and denied that it was under any obligation to take or dispose of any part of the bond issue. This phase of the matter was continually in dispute between the parties. Upon the refusal of the plaintiff to take or place one half of the bonds as defendant contended it was its duty to do, the defendant continued with its building operations, but was

---

twelve months from and after the first day of the month next following the date of written notice of termination by either party to the other, provided that no such termination shall occur or take effect prior to July first, 1921.

. 20. Failure of either party to require strict performance in any respect shall not be a waiver of any right to subsequent performance of all stipulations herein contained.

21. Times of performance by either party shall be extended upon written request, for wars, strikes, fires, floods, accidents, shortage of raw materials, or other causes beyond the control of the party delayed, but not for a longer time than the actual period of continuance of such causes of delay.

In witness whereof the parties hereto have caused this contract to be duly executed the day and year first above written.

JOHN STRANGE PAPER COMPANY,

By John Strange, President.

KIECKHEFER BOX COMPANY,

By J. W. Kieckhefer, President.

obliged to re-finance itself, and in order to do this was obliged to seek a new market for its bonds, to secure appraisals and examinations of its property, and to meet the varied requirements of the parties who proposed to take over the issue. It is the contention of the defendant that the whole matter of the delay hereinafter more specifically referred to is largely attributable to the failure of the plaintiff to take and place one half of the bond issue for the reason that it was unable to proceed expeditiously, and thereby the construction work, particularly the foundation work, was thrown into the winter season of 1916 and 1917, a winter of unusual severity, and into a time when, by reason of the entry of this country into the war, the procuring of materials and labor was increasingly difficult. This issue was one of the matters sharply litigated upon the trial. According to its claim, the defendant also had difficulty in procuring permission from the War Department to encroach upon the bed of Fox river. It is further claimed that timbers necessary to the construction work, ordered by it in December with assurances on the part of the sellers that the same would be delivered within two weeks, were not in fact delivered until June, 1917, due to the traffic congestion attendant upon the entry of this country into the war and the consequent disorganization of the railroad service; that other material was delayed for like reason; that there was also a delay due to the failure of the railway companies to provide the necessary spurs and switch tracks. In November, 1916, the question of whether or not the progress of the work had been so delayed as to render its completion probable in time to commence supplying the plaintiff with paper board on July 1, 1917, was up for consideration. In response to an inquiry from plaintiff, on November 22, 1916, the defendant wrote:

"We have the foundations for the paper mill itself practically finished, and as the building is to be of brick, we

shall work on it during the winter and have this building as well as our warehouse ready in ample time to get the mill in operation by July 1st.

"The paper machine itself will be shipped in March, and will be followed by the engines, beaters, jordans, pumps, and other equipment at about the same time.

"We have the boilers already on hand, as well as one of the engines. We are now building a new chimney which will enable our having the new boiler plant in operation this year, a thing which we desire.

"We are well pleased with the progress we have made, and, as stated above, are sure there will be nothing that will prevent our work being completed on time, or a little sooner than July 1st."

In response to this, plaintiff wrote under date of November 27, 1916:

"I have been a little worried over the work for the reason that the cold weather is approaching, and comparatively little work has been done during the fair weather we have been having during the past three or four months.

"However, you are more familiar with the entire proposition than I am, and your assurance is entirely satisfactory to me and relieves me considerably.

"You, of course, realize that we are depending upon this new mill for our entire supply of board after July 1, 1917, and it would be a very serious matter if there should be any delay."

There was further correspondence between the parties as to the progress of the work during the month of December, 1916. Under date of December 18th Mr. Kieckhefer, president of the plaintiff, wrote:

"I cannot impress upon you sufficiently the serious results of any delay in getting the mill in operation beyond July 1, 1917.

"As I have explained to you before, we are depending absolutely for our supply of board on this new mill after July 1, 1917, and a delay is likely to put us practically out of business."

Under date of December 22, 1916, Mr. Strange wrote as follows:

"The biggest reason for delay in the construction of our new mill was your refusal to take the bonds as we understood you were to take them; and which had you done so would have prevented the delay of providing funds in a different manner. . . .

"We have a big job confronting us, but we hope to get the new mill in operation by July 1st. Of course much depends on the weather. We shall keep at work all of the time, however, even in bad weather, in spite of the fact that the cost will be greatly increased over mild-weather conditions.

"One very favorable feature is our having all the needed machinery ordered and promised for delivery in time to complete the work on time."

The correspondence between the parties discloses that they were co-operating in an endeavor to expedite the work and secure early deliveries of materials. Under date of March 1, 1917, Mr. Kieckhefer, plaintiff's president, wrote:

"We feel strongly impressed with the belief that you will not be ready on time, and are also greatly worried by uncertainty as to what we should do to prevent or reduce the large financial loss that will, as stated, result to us and to you should you fail to complete your work within time,"

and urged that the defendant write him fully and frankly in regard to the situation.

A letter of the defendant under date of March 5, 1917, referred to the unprecedented cold weather of the winter and says:

"Getting this mill in operation on time means just as much to us as to you, and we are doing everything we know how to do to get things ready for you. . . .

"If you think it wisest for you to buy some liner and chip on the market, then buy, although we consider this unnecessary."

Under date of May 30, 1917, the defendant wrote the

plaintiff, reciting the matter of delays, causes therefor, and indicating that the mill would not be completed in time to commence deliveries on July 1, 1917, but that it would probably be completed by September 1st, and it contained the following offer:

"Pending the time between July 1st and the date of starting the new mill we are disposed to continue supplying you the same quantity and upon the same terms as we have been supplying you and upon which our contract expires the 1st of July."

This was the first letter that suggested that deliveries would not begin July 1, 1917.

Under date of June 9, 1917, Mr. Kieckhefer, plaintiff's president, wrote:

"We are deeply disappointed at your attitude as it is expressed in your letter of the 30th ult., and we must take decided exception to the manner in which you treat performance of the contract on your part. We must also make clear to you that we do not wish to be understood to be acceding to this delay or to be granting any extension of time, but on the contrary, we insist upon prompt performance and stand upon our rights under the contract. We feel that we are in no wise responsible for any delay beyond July 1st and that you have no valid excuse for the same."

The letter also contained a proposition to accept quantities of board as specified in the old contract, upon terms specified in the new contract, additional material to be purchased in the open market.

Under date of June 11th the defendant claimed exemption under paragraph 21 of the contract above quoted, after reciting quite fully the causes of the delay as claimed by it. The plaintiff replied that it would not accede to defendant's claim that the delay was in any way due to its failure to take a part of the bond issue and that it would not recognize the right of the defendant to resort to the provisions of paragraph 21 of the contract. The dispute as to responsi-

bility for delays continued in subsequent correspondence and negotiations for supplying the plaintiff with board from the old mill continued.   Finally, under date of July 11, 1917, plaintiff made the following proposition:

"We shall until completion of the new mill rely upon you to deliver to us container liner to the amount of your full production for three days of each and every week upon the basis of price, terms, etc., governing our contract which expired July 1st, provided that you push completion of the new mill as speedily as possible, and that we will accept these deliveries as applying in part only upon the calls of the new contract dated June 29, 1916, reserving and saving our right to purchase elsewhere such additional material as we may be entitled to under this new contract, and that we will look to you for reimbursement for what the material so furnished by you and the material so bought elsewhere may cost us in excess of the price agreed upon under the contract of June 29, 1916, and provided further, that, as was clearly stated at our meeting on Saturday, it be distinctly understood and agreed that whatever is done by either you or ourselves along the lines above stated shall in no event be construed as an admission by either of us against, nor shall either of us be deemed to have in any way waived or prejudiced, our respective interests, claims, or defenses relative to any of the matters of difference under the new contract, the arrangement stated being entered into for the mere purpose of minimizing damage, yet leaving us entirely free to sue for and recover whatever damages we may justly be entitled to from you by reason of any breach of the new contract, and likewise leaving you free to make your just defense against our claim for such damages. Please confirm these conditions by letter."

In response, under date of July 12th, defendant wrote:

"We are disposed to continue making for you the full product of our going cylinder paper machine for at least three days in each week, until our new mill is in operation, upon the same terms strictly, as applied in our contract with you which expired July 1, 1917.  We do not accept any reference to real or imaginary damage you may think you are justified in keeping in your mind because of delay in the

completion of our new mill, as in any way associated with supplying you liner from our present mill.

"The two deals must be absolutely distinct and unrelated. . . .

"We shall use our best judgment and means of completing the new mill as early as possible; but if for any cause we are delayed longer than now appears, we cannot encourage you to believe we will pay any damages to you in any sum.

"We are proceeding to run the three days each week for you under the spirit of this letter, and if this is not acceptable to you, you will kindly so advise us."

Under date of July 13th plaintiff replied as follows:

"Our letter of the 11th is a clear statement of our position and of our understanding of what was said at our meeting last Saturday.

"As we read both of these letters, the intention of both parties is made clear. You wish to save your rights and we wish to save ours, as to the undetermined matter of difference under the new contract, and neither desires to admit away its position.

"In the meantime you will make shipments from the old mill and we will pay for these at the same price and terms as were provided in the contract which expired July 1, 1917."

There was no further correspondence for a month, when, under date of September 20, 1917, the defendant wrote the plaintiff as follows:

"From the present outlook we shall not be ready to make any board in our new mill sooner than January 1st.

"This we regret for many reasons, and among the chiefest is the need of the profit assured in the contract with you. . . .

"Before we begin to operate under the contract drawn with you, we must get together and construe plainly some contradictions or ambiguous clauses which might invite trouble if left in doubt. . . .

"We refer to section number 21 in this enforced notice of unavoidable delay."

Under date of September 28th the attorneys of the plaintiff wrote the defendant as follows:

"Your letter of the 20th inst., addressed to Mr. J. W. Kieckhefer, president of the *Kieckhefer Box Company,* and which he received on the 24th inst., has been referred to us for attention and reply. In line with communications which have heretofore been sent you by client, we are instructed to, and hereby do, notify you that the *Kieckhefer Box Company* has elected to rescind the contract which it entered into with you under date of June 29, 1916, upon the ground that you have broken the same."

To this letter the defendant made no reply, but consulted its local attorney, by whom it was advised that there was no sufficient ground for the rescission of the contract by the plaintiff, but that it was "an absolute attempt on their part to rescind the contract, and if he [defendant] chose to accept that view of it at that time, that was his privilege to so accept it and act upon."

The new mill was completed and began operations in May, 1918, and on the 24th day of June, 1918, this action was begun by the plaintiff to collect damages in the sum of $275,000 by reason of the fact that the defendant violated the terms and conditions of said contract in the following respects:

"1. In that it failed and neglected to install, by July 1, 1917, or to maintain at any time on or after said date, in its plant in Menasha, Wisconsin, the paper machine or any of the supplementary machinery and equipment mentioned in said contract, although by this plaintiff repeatedly requested and urged so to do.

"2. In that it utterly failed and neglected to produce and furnish to this plaintiff any of the paper board or material called for by said contract.

"3. In that it utterly failed and neglected to construct or equip any of the buildings mentioned in said contract and required for the handling and storage of any of the raw material or finished board covered by said contract or to maintain any such buildings at any time on or after said July 1, 1917.

Kieckhefer Box Co. v. John Strange Paper Co. 180 Wis. 367.

"4. In that it utterly failed and neglected to manufacture or sell or to ship or deliver to this plaintiff, or to load on cars, as by said contract required, any of the paper board or material therein specified at any time on or after said July 1, 1917, although by this plaintiff repeatedly urged so to do and although this plaintiff was at all times ready and willing to purchase and accept the same from said defendant.

"5. In that said defendant, by reason of the other defaults hereinbefore set forth, became and at all times on and after said July 1, 1917, was and remained unable to manufacture, furnish, ship, or deliver to this plaintiff any of said paper board or material.

"6. In that said defendant refused to carry out and perform said contract in the various respects hereinbefore set forth on and after said July 1, 1917."

The answer contained a general denial and allegations setting forth facts alleged to constitute an excuse for the failure of the defendant to deliver the paper at the time specified in the contract. Inasmuch as the first paragraph of this part of the answer states in a condensed form the situation of the parties as claimed by defendant, it is set out in full:

"That the said contract contemplated the expenditure of more than $300,000 for mill, warehouses, buildings, and machinery. That at the time of making said contract it was thoroughly discussed by the parties, their officers, and agents, that in addition to building, constructing, and completing the mill, warehouse, and other buildings, necessary to manufacture the said paper boards and products for plaintiff, paper machines and machinery of intricate and difficult construction must also be secured, constructed, and installed and transported from great distances; that some of the lumber and timbers to be used in the construction of said mill buildings must be transported by rail from great distances; that additional sidetracks must be built by the railway companies; that additional electric power must be secured, arranged for, and installed, and the entire project must be financed; and it was also discussed and well known to the parties, their officers, and agents, that because of the conditions then existing, and the probability of future disturbance in the industrial and financial markets into which

defendant must go for the necessary material, machinery, labor, supplies, and financial aid to enable it to complete and put into operation said mill so as to comply with the terms of said contract, that delays and obstacles not then apparent might be met, and for such reasons the provisions for extension of time for deliveries of said paper board and product were inserted in said contract."

By par. 2 the defendant set out its version as to the agreement by the plaintiff that plaintiff should take and place $150,000 of bonds in order to finance the undertaking.

By par. 3 the defendant set out the circumstances in regard to encroachment upon the river bed of Fox river by the proposed construction and the difficulty of obtaining permission from the government to make such encroachment.

By par. 4 the severity of the weather during the winter of 1916–17.

By par. 6 the difficulty in regard to labor strikes, the interference with the work by reason of strikes, and the difficulty in securing competent help.

By par. 7 the failure of the railway companies to provide the necessary sidetracks and spur tracks.

By par. 8 the difficulty of securing prompt deliveries of materials necessary to construct the plant and the difficulty of co-ordinating deliveries.

By par. 9 it set out the difficulty encountered in procuring necessary power.

The defendant claimed that by reason of the unavoidable delays caused by the matters set out in par. 1 to 9 of sub. III of its answer, it was entitled to have the time of delivery postponed until a time long after September 28, 1917, when the plaintiff wrote its letter of rescission.

It was further alleged that the defendant kept the plaintiff fully informed of the difficulties and obstacles encountered and that plaintiff and its employees had full access to the premises and were fully advised as to all the conditions under which the work of construction was proceeding; that

it used all reasonable diligence to complete the mill build-
ings and install the machinery and equipment at the earliest
possible date in order that it might comply with its contract.

The defendant by sub. VIII of its answer set up the facts
in regard to the writing of the letter of September 28, 1917,
and claimed that thereby the plaintiff had fully rescinded the
contract and released and discharged the defendant from all
liability and obligation thereunder.

The case was tried by the court without a jury. The court
made and filed findings of fact, whereby it found in favor
of the contention of the defendant, that the plaintiff had
agreed orally to take or place one half of the bond issue,
amounting to $150,000; that after the defendant was advised
of the refusal of the plaintiff to take or place any part of
such bond issue the defendant company could with rea-
sonable dispatch have floated all or a large part of its bonds
by January 16, 1917; that, with full knowledge of plaintiff's
refusal to purchase bonds, the defendant elected to proceed
under its contract.

The remaining findings of fact cannot be stated more
briefly than by setting out the findings *in extenso:*

"II. The defendant entered upon the performance of its
obligations under the contract in suit promptly upon the
execution thereof. The refusal of the plaintiff to perform
its agreement to take or place one half of the defendant's
proposed bond issue forced the defendant to find another
outlet for the bonds, to make temporary provision for
finances as above indicated, and seriously delayed the de-
fendant in the work of constructing its new mill.

"III. From the beginning of the construction work under
the contract down to May 30, 1917, the defendant company
time and again assured plaintiff, both by letter and by word
of mouth, that the mill would be ready for operation on
or before the date specified in the contract. (Exs. 7, 12,
17, and 23.) On May 30, 1917, the defendant asked for
an extension for sixty days because of the severe winter
and the delay in getting the government permit. On June
18, 1917, the defendant, in writing (Ex. 29), asked for an

extension 'until such time as represented by the period through which we were unavoidably delayed has elapsed, subsequent to July 1, 1917.' · The causes for delay assigned were failure to take bonds, delay in getting government permit, and unusually severe winter. No other request for extension of time was made. On September 20, 1917, the defendant named January 1, 1918, as a probable date of starting the new mill, and named the failure to provide switch tracks as an additional cause of delay.

"IV. The winter of 1916–1917 was one of unusual severity and the spring was cold and rainy. These weather conditions necessarily slowed up the work which had to be done at that time because of the failure of the plaintiff company to take one half of the defendant company's bond issue. On December 22, 1916, the defendant advised the plaintiff, by Ex. 17, of sixty days' delay because of its failure to take the bonds, and plaintiff knew without notice that the severe winter weather would retard the work. (Ex. 15.)

"V. The delay caused by the refusal of the plaintiff to perform its agreement to take or place one half of the bond issue, and the delay caused by the weather, were inter-related; though the failure to take the bonds is the primary cause of the delay. The delay occasioned by these two causes together is held to be ninety days.

"VI. The defendant was not actually hindered in the work of constructing the new mill by the delay of the federal government in issuing a permit to allow the defendant to encroach upon the bed of the Fox river with its building. Furthermore, the defendant did not apply to the plaintiff for an extension under paragraph 21 of the contract for the delay claimed to have been caused thereby, while such alleged cause of delay was operating.

"VII. No written notice under paragraph 21 of the contract was ever given by the defendant to the plaintiff, asking an extension of the time of performance for difficulties in procuring labor, or for delays occasioned by labor and railroad tie-ups, or for delays caused by tardy arrival of lumber or piping. It does not appear from the evidence that the delays resulting from these causes would have extended beyond the ninety-day period heretofore referred to in finding No. V.

"VIII. No notice was given by the defendant to the plaintiff asserting delay under paragraph 21 of the contract by reason of the failure of the railroads to install the necessary sidetracks, until September 20, 1917. The Chicago, Milwaukee & St. Paul Railroad sidetracks were completed in August, 1917. The Northwestern sidetracks were completed in November, 1917. At this time the new mill was not complete, and the absence of sidetracks did not delay or prevent the operation of such mill. The absence of these sidetracks presented difficulties in the work of constructing the mill and warehouse and installing machinery, but not to such a degree as to constitute a cause 'beyond the control' of the defendant.

"IX. The defendant was never delayed in the construction or operation of the new mill by an inadequate supply of electric power. It never asked for an extension of time because of the failure of the traction company to furnish power. Defendant's first mention of the failure of the traction company to furnish power was Ex. 32, dated June 22, 1917.

"X. The new paper-mill machine was not ready for operation on July 1, 1917. Shortly after that date the parties entered into an agreement whereby the defendant bound itself to furnish to the plaintiff board of the contract classes to the extent of at least three days' run a week from its old mill, and to continue so to do until the new mill should be completed. The plaintiff agreed to accept and pay for such board at rates differing from those specified in the contract in suit. It was agreed that this arrangement should constitute a separate contract, entirely unrelated to the contract in suit. It was made with the express understanding that it should not in any way operate to change the position, attitude, and rights of either party under the contract in suit.

"XI. On September 20, 1917, the defendant notified the plaintiff that it could not begin deliveries from the new mill under the contract in suit before January 1, 1918 (Ex. 41) ; and also that, before the parties began to operate under the latter contract, it would be necessary for them to meet and 'construe plainly some contradictions or ambiguous clauses (in the contract in suit) which might invite trouble if left in doubt.' On September 28, 1917, the plaintiff, through its attorneys, replied that 'in line with communications hereto-

fore sent' the defendant by the plaintiff, it 'hereby elects to rescind' the contract in suit. (Ex. 42.)  The words 'in line with communications heretofore sent you by client' refer to Exs. 28, 30, 33, 38, and 40, which letters contain the plaintiff's contention that the contract was breached by defendant's failure to make deliveries commencing July 1, 1917.  The plaintiff at the time of writing Ex. 42 believed the contract in suit was advantageous to it.  The plaintiff did not by the letter Ex. 42 intend to rescind the contract in suit, but merely to terminate the same, preserving any claim against the defendant for damages thereunder which it might have."

The twelfth finding relates to the matter of conversion cost, which is not material here in the view which we take of the case.

The court found as conclusions of law that

"I. Under clause 21 of the contract written request was essential for extension of time unless in some manner waived; but this has no application to delay caused by plaintiff's refusal to take one half of the defendant's bond issue.  There was no waiver by plaintiff of the provisions of clause 21.

"II. The defendant is entitled to an extension of the period for the completion of its new mill for ninety days from July 1, 1917, because of delays resulting from the refusal of the plaintiff to take or place one half of the proposed bond issue and from adverse weather conditions. It was therefore not bound to commence deliveries of board under the contract in suit until September 29, 1917.

"III. The defendant is not entitled to any extension of the contract date for the commencement of deliveries from the new mill for any of the other causes of delay asserted by it.

"IV. The so-called 'three days run a week' agreement did not operate to defeat or modify or affect in any manner the rights of the parties under the contract in suit, and did not constitute an election to keep alive that contract.  (Letter of September 20, 1917.)

"V. When the defendant informed the plaintiff, by Ex. 41, that it would make no deliveries before January 1, 1918,

it breached the contract, and the plaintiff had the right to act without delay on that information.

"VI. The letter sent by the plaintiff, through its attorneys, to the defendant under date of September 28, 1917 (Ex. 42), constituted an election by the plaintiff to terminate the contract in suit for all purposes of performance for breach thereof by the defendant, but to hold the defendant liable for any damages which the plaintiff might suffer by reason of such breach."

Other conclusions relate to the matter of damages and it is not necessary to set them out here.

An interlocutory judgment was entered in accordance with the findings and conclusions of the court by which the matter was referred to a referee to fix the amount of damages. From the judgment the defendant appeals.

Notice was given under the provisions of sec. 3049a, Stats., and a cross-appeal was taken by the plaintiff. The assignments of error under the notice and cross-appeal relate entirely to the measure of damages and need not be further considered here.

ROSENBERRY, J. Mr. Justice DOERFLER did not sit in this case, being disqualified by reason of the fact that he had been of counsel in the case, and, as indicated in the former opinion, the findings of the trial court were in part affirmed under the rule by reason of the fact that the Justices sitting were equally divided upon the question. The situation presented by the facts in this case had led us to reconsider the effect of an order granting a motion for a rehearing.

In *Fallass v. Pierce,* 30 Wis. 443, at p. 454, it was held that by the granting of a motion for a rehearing the judgment of this court was set aside and the entry thereof vacated, and that the cause was then to be heard and considered as if it had never been argued or decided. Such was the common-law rule. *Longworth v. Sturges,* 2 Ohio St. 104; *Gilbert v. Southern Ind. C. & I. Co.* 62 Ind. 522.

In other jurisdictions the common-law rule has been modified and it is held that, when a rehearing is ordered, the first opinion is simply suspended and ceases to have any effect except as incorporated in or approved by the opinion filed on the second hearing. See, generally, 4 Corp. Jur. p. 641, § 2529, and cases cited.

The rule laid down in *Fallass v. Pierce, supra,* has to some extent been lost sight of as indicated by the mandates of this court in *Nat. L. Ins. Co. v. Brautigam,* 163 Wis. 270, 154 N. W. 839, 157 N. W. 782, and *Beebe v. M., St. P. & S. S. M. R. Co.* 175 Wis. 234, 182 N. W. 743, 185 N. W. 177, and other cases.

After a careful reconsideration of the entire matter, and particularly in view of the experience of the court in recent years, we are of the opinion that the rule should be restated, and it is now held that hereafter the granting of a motion for a rehearing shall not, unless otherwise indicated in the order granting the rehearing, operate to set aside the former judgment and vacate the entry thereof, but that the judgment of this court shall stand unless and until it shall be set aside, reversed, modified, or affirmed by a subsequent order or judgment upon the rehearing.

We adopt this rule as being more consonant with the reasons for the granting of motions for rehearings in this court. The fact that a doubt is aroused in the minds of the Justices sitting as to the correctness of a judgment already entered is not sufficient ground for setting aside that judgment. On the other hand, the doubt may be of such a substantial character as to justify a reconsideration and a reargument upon the propositions involved. The rights of the parties, however, ought not to depend upon the fact that the court is willing to hear further argument. The court may be convinced that the matters presented are entitled to a reconsideration and still not be convinced of error. If upon the reargument the court is not convinced that the former

judgment should be modified or vacated and set aside, it should stand. This rule permits the losing party to present the grounds upon which a motion for a rehearing is made, without requiring that thorough, complete, and exhaustive presentation which should be made upon a reargument. If the motion for a rehearing is sufficient to arouse in the mind of the court a doubt of a character which justifies a reconsideration of the case, the moving party may then, in the event the motion is granted, have adequate time in which to prepare and present the matter in greater detail.

The matter is germane to the decision in this case because of the fact that the prior judgment which was entered under the rule by reason of an equal division of the Justices should be set aside, for the determination now rests upon a proposition which makes a consideration of the matters upon which the court was equally divided unnecessary. Hereafter, under the rule now adopted, when a motion for a rehearing is granted, the mandate upon the rehearing should declare whether the original judgment is affirmed, set aside and vacated, or modified.

The defendant makes the following contentions:

First. That it was not in default under the contract in suit on September 28, 1917, the date of the writing of the rescission letter, for the reason that the ninety-day extension of the construction period allowed by the decision of the trial court and not challenged by the plaintiff on this appeal had not then expired.

Second. That the defendant's letter of September 20, 1917, did not constitute a breach of the contract in suit.

Third. That on September 28, 1917, it was still entitled to a reasonable additional period extending beyond January 1, 1918 (the date specified in defendant's letter of September 20, 1917), in which to complete the new mill by reason of the several causes of delay hereinbefore referred to and more particularly set out.

Fourth. That the so-called three-days-run-a-week agreement, made by the parties in July, 1917, was still in force on September 28, 1917, and deprived plaintiff of the right then to assert the noncompletion of the new mill as a breach of the contract in suit.

Fifth. That the contract in suit had been so far performed by the defendant on September 28, 1917, that the plaintiff had no right to rescind or terminate it for the breach alleged, but was in duty bound to accept performance thereafter from the defendant, subject to a right of recovery of such damages as plaintiff suffered by virtue of the delay and were not legally excused.

Sixth. That plaintiff's letter of September 28th, wherein it elected to rescind the contract in suit, being acquiesced in by the defendant, constituted a rescission by agreement and released the defendant from any liability under the contract.

For reasons hereinbefore stated we shall consider only the fourth and fifth contentions made by the defendant. If it be assumed as contended by the plaintiff that the letter of September 28th, in which the plaintiff stated that it "elected to rescind the contract which it entered into with you under date of June 29, 1916," to which defendant made no reply, did not amount to a rescission by agreement, the question then arises whether or not the plaintiff was justified in refusing to proceed further under the contract under all the facts and circumstances. The right to terminate is asserted by the plaintiff under the provisions of sec. 1684t—45 of the Uniform Sales Act.

"Section 1684t—45. 1. Unless otherwise agreed, the buyer of goods is not bound to accept delivery thereof by instalments.

"2. Where there is a contract to sell goods to be delivered by stated instalments, which are to be separately paid for, and the seller makes defective deliveries in respect of one or more instalments, or the buyer neglects or refuses to take delivery of or pay for one or more instalments, it depends in

each case on the terms of the contract and the circumstances of the case, whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract, or whether the breach is severable, giving rise to a claim for compensation, but not to a right to treat the whole contract as broken."

Whether or not the breach of a contract to deliver goods by instalment is, by reason of the failure of the seller to deliver one or more instalments, so material as to justify the buyer in refusing to proceed further, is a question of fact. *Corey Co. v. Minch,* 82 N. J. Law, 223, 82 Atl. 304. See, also, *Helgar Corp. v. Warner's Features,* 222 N. Y. 449, 119 N. E. 113; *E. I. DuPont de Nemours P. Co. v. United Z. & C. Co.* 85 N. J. Law, 416, 89 Atl. 992.

Where the failure to perform as to one instalment is coupled with conduct or a declaration which amounts to a repudiation of the contract, it constitutes a material breach as a matter of law. *Ambler v. Sinaiko,* 168 Wis. 286, 170 N. W. 270; *Chess & Wymond Co. v. La Crosse Box Co.* 173 Wis. 382, 181 N. W. 313.

The trial court found as a matter of law that when the defendant, by its letter of September 20, 1917, notified the plaintiff that it could make no deliveries on the contract before January 1, 1918, it amounted to a breach of the contract and that the plaintiff was thereupon justified in terminating the contract and had a right to look to the defendant for damages as and for a breach of the entire contract. It does not appear what, if any, consideration the court gave to the provisions of sec. 1684t—45, nor did the court in any manner characterize the materiality of the breach nor attempt to determine what relation "the terms of the contract and the circumstances of the case" had to the breach of the contract, which in the opinion of the court justified the plaintiff in refusing to proceed further and in suing for damages for breach of the entire contract.

Ordinarily, in mercantile contracts, time is of the essence of the contract and agreements in relation thereto are ordinarily to be regarded as a warranty or condition precedent, and upon failure or nonperformance thereof the party aggrieved may repudiate the entire contract. *Norrington v. Wright,* 115 U. S. 188, 6 Sup. Ct. 12, 29 Lawy. Ed. 366. See cases cited in Rose's Notes; Williston, Sales, § 189; 4 Page, Contracts (2d ed.) § 2104; note in L. R. A. 1916E, 940.

The tendency of modern law is to relax the strictness of this rule. This is indicated both in decisions and in statutes. 4 Page, Contracts (2d ed.) § 2106.

In *Helgar Corp. v. Warner's Features,* 222 N. Y. 449, 119 N. E. 113, it is said that the rule established by sec. 45 of the Uniform Sales Act is a departure from the rule of the English statute, which keeps the contract alive unless the breach is equivalent to repudiation, and that a new test has been established, which weighs the effect of the default and adjusts the rigor of the remedy to the gravity of the wrong.

In New York it was the rule, prior to the enactment of the Uniform Sales Act, that failure of one of the parties to tender delivery or to pay for an instalment due entitled the other party to rescind the entire contract as a matter of law. *Miller & Sons Co. v. E. M. Sergeant Co.* 191 App. Div. 814, 182 N. Y. Supp. 382.

In *E. I. DuPont de Nemours P. Co. v. United Z. & C. Co.* 85 N. J. Law, 416, 89 Atl. 992, it is said:

"The rule formerly established in *Blackburn v. Reilly,* 18 Vroom, 290, 1 Atl. 27, has been changed by statute (sec. 45). The question now is whether the breach in failing to deliver monthly instalments is so material as to justify the plaintiff in refusing to proceed further and suing for damages, or whether the breach is severable, giving rise to a claim for compensation but not to a right to treat the whole contract as broken."

In *Blackburn v. Reilly,* 18 Vroom, 290, 1 Atl. 27, it was

held that in contracts for sale of goods to be executed by a series of deliveries and payments, defaults of either party with reference to one or more of the stipulated acts will not ordinarily discharge the other party from his obligation, unless the conduct of the party in default be such as to evince an intention to abandon the contract or a design no longer to be bound by its terms.

To substantially the same effect was the law of this state. *Campbell & Cameron Co. v. Weisse,* 121 Wis. 491, 99 N. W. 340. Sec. 45 has not frequently been construed.

It has been said:

"If the question as to the materiality of the breach of the contract means the materiality of the breach of the particular instalment, and if it assumes that the breach as to one instalment, if material as to that instalment, will operate as a discharge of the entire contract at the election of the party who is not in default, no objection can be made to the result, although the wording may not be the clearest imaginable. If the 'materiality of the breach' refers to the contract as a whole, and if, after a material breach as to one instalment is shown, the question of fact remains as to the effect of such breach upon the remaining covenants of the contract, the statute avoids laying down a rule as to even the *prima facie* effect of the breach as to one instalment upon the remaining covenants of the contract." 5 Page, Contracts (2d ed.) § 3018.

To so construe the statute as to make it applicable to a single instalment would leave the law exactly where it was before so far as its effect upon the entire contract is concerned. In those jurisdictions where it was held that a breach as to an instalment, in the absence of an intent to repudiate or abandon the contract, did not justify a refusal of the injured party to proceed further, that rule would still obtain, while in jurisdictions like New York, where material breach as to an instalment afforded ground for termination as a matter of law, that rule would still operate.

Courts have been accused of refusing to give effect to

legislative enactment where the provisions of the statutes run counter to their juristic ideas. Spirit of the Common Law (Pound), 106.

Whatever the rule or practice may be in other jurisdictions, this court has adhered consistently to the rule that where the language of the statute is plain and unambiguous it is not subject to construction and is to be enforced and applied in accordance with its terms, and that construction can be resorted to only when there is real uncertainty as to the meaning and intent of the legislative declaration. *Burgess v. Dane Co.* 148 Wis. 427, 134 N. W. 841; *Mellen L. Co. v. Industrial Comm.* 154 Wis. 114, 142 N. W. 187.

It may well be that the statute is difficult of application in particular cases, due to the fact that the materiality of the breach may be such as to leave doubt as to whether or not it justifies the injured party in refusing to proceed further. It may be that in some cases it will be impossible to determine without the aid of a court or jury whether or not a breach as to a particular instalment is so material as to justify the injured party in refusing to proceed further.

If the application of the statute produces a result which does not accord with sound business practice and policy, the remedy lies with the legislature and not with the courts. The statute plainly relates to damages for breach of the "entire contract" and to the right of the injured party "to treat the whole contract as broken." If uncertainty arises in the application of the law of contracts falling within this subdivision, the uncertainty is introduced by the act of the legislature and not otherwise. To say that when a breach as to an instalment is established there is no further question of materiality to be considered as affecting the entire contract is in effect to construe away the statute.

It is our conclusion that by sec. 45 it is made a question of fact in each case whether or not, taking into consideration the terms of the contract and the circumstances of the case,

the breach as to a single instalment, although complete as to that instalment, is so material as to justify the opposite party in refusing to further perform and to sue for damages for breach of the entire contract, or whether the breach is severable, giving rise to a claim for damages but not justifying the injured party in treating the whole contract as broken. To determine whether or not there is a material breach in a given case where there is no evidence of abandonment or repudiation requires a determination as to a matter of fact, and the result in each case must depend upon the facts and circumstances when considered in connection with the terms of the contract in each case. *Greer v. Oelhafen, ante,* p. 131, 192 N. W. 467, and cases there cited.

The trial court found as a matter of law that the letter written by the defendant under date of September 20, 1917, in which the plaintiff was advised that defendant would be unable to commence deliveries before January 1, 1918, constituted a breach of the contract which justified the plaintiff in refusing to proceed further. It is plain from the terms of the contract that the material contracted for was to be delivered in instalments of the kinds and quality specified by the plaintiff and to be paid for as delivered. The amount to be delivered was the product of the machine to be installed. Inexcusable failure of the defendant to commence deliveries at the time specified, under all the authorities, amounted to a breach of the contract. We must therefore consider whether or not this breach was so material as to justify the plaintiff in treating the contract as discharged.

The statute enjoins us to take into consideration the terms of the contract. While the contract was treated upon the argument as one for the sale and delivery of personal property and therefore to be governed by the provisions of the Uniform Sales Act, it was much more than that. By its terms the commencement of deliveries was to be postponed for more than a year; the plaintiff agreed to erect and equip

a large paper-making plant, involving an outlay in excess of $300,000. It was contemplated by the parties at the time the contract was entered into that the plaintiff might meet with unexpected and unavoidable delays, hence the provisions of paragraph 21 heretofore quoted. The plaintiff (par. 11 of the contract) was to supply the raw materials, which were to be manufactured into paper. The right of the defendant to procure such materials was contingent upon the failure of the plaintiff in that regard. The price was not a definite price, but one to be determined by the cost of the raw materials, plus the cost of conversion, plus the profit specified in the contract. The defendant could not have discharged its obligations under the contract in any other way than by the erection of the mill and the manufacture of the paper under the conditions specified in the contract; that is, it was not authorized to procure the manufacture of paper elsewhere or to provide it by recourse to the open market. In one view of the case the defendant was a mere operator, who engaged to manufacture a certain product from materials to be furnished by the plaintiff.

What were "the circumstances of the case?" In the first place, the court found that by reason of the refusal of the plaintiff to accept or place one half of the bond issue and because of adverse weather conditions, the date of the delivery was, under the terms of the contract, postponed ninety days, so that performance instead of being due July 1, 1918, was due September 29, 1918. The defendant, in reliance upon the contract, had proceeded with the construction of the mill, had at the time of writing the letter of September 28, 1917, expended an amount in excess of $300,000, and while the court found that a sufficient claim for allowance under the provisions of paragraph 21 had not been made to entitle the defendant to further extension, it is clear that the defendant in the erection of the plant had to contend with obstacles of a most unusual character and conditions which could not

readily have been foreseen at the time the contract was entered into. It is a matter of common knowledge that construction work during the time shortly before and after this country entered the World War presented a most difficult and perplexing problem—labor was scarce, young men were being called to the colors, industry was turning its attention to the production of war material, with a result that commerce and transportation generally were greatly dislocated. While these conditions may not be said to excuse the performance, they are certainly circumstances to be taken into consideration in determining the nature and materiality of the breach. There is not in the entire case a single word of testimony which even squints toward the fact that the defendant at any time contemplated the abandonment of its contract, and in this connection we have in mind the statement made in defendant's letter of September 20, 1917, as to construction of the contract. From November, 1916, when the first question arose as to whether or not the mill would be in operation at the time specified in the contract, down to the letter written September 28, 1917, every utterance of the defendant and its officers, both oral and written, indicated that it was proceeding and intended to proceed with the utmost dispatch to complete the erection of the mill. By the terms of the contract, if it be construed as claimed by defendant and as the trial court construed it, the failure of the defendant to complete the mill entailed a loss in profit on the paper and interest on its investment (par. 12 and 13 of contract) which it was entitled to earn under the contract, amounting to $6,000 to $8,000 per month. As the defendant intimated, it needed no other spur than the loss of the profits to incite it to greater efforts to complete the plant.

What were the circumstances of the plaintiff? The plaintiff had at all times insisted upon strict compliance with the contract and had co-operated, except by its refusal to take or place the bonds, to that end. It had used its influence in the

purchase of supplies and equipment and at all times expressed concern as to whether or not the contract should be completed, so that the plaintiff cannot be said to in any sense have waived its rights under the contract. The plaintiff was engaged in a business which required a continuous supply of raw material in the shape of chip board. When it became apparent to the defendant that the mill would not be completed, it notified the plaintiff to that effect and offered to supply the material required by the plaintiff in the operation of its factory from its old mill. Negotiations along this line resulted in the "three days a week agreement," referred to in the statement of facts. There existed at that time a controversy between the parties as to the allowance which the defendant was entitled to claim for unavoidable delays, and in that respect neither party was willing to concede anything to the other. The plaintiff asked that deliveries from the old mill be made to apply upon the new contract. This defendant refused to do, but offered to make the deliveries upon the price and terms contained in the old contract, and the parties finally arranged that the defendant should operate its mill and manufacture for the plaintiff three days of each week the material specified by the plaintiff and that this arrangement should continue until such time as the new mill was in operation and material was being supplied under this contract, when the defendant wrote the letter of September 20, 1917, advising the plaintiff that it would not be able to commence operations in the new mill until January 1, 1918. The right of the plaintiff, if any it had, to terminate the contract arose at that time and the court may not properly take into consideration the subsequent course of events. Released from the pressure to which it was subjected by the new contract, the defendant may have for valid reasons not hastened the work as rapidly as it otherwise would have done. In this connection it is to be noted that the defendant did not deny its obligations under the contract such as they were, but by mutual agreement the

question as to the respective rights of the parties under the new contract was left entirely open; neither party was to be foreclosed in any respect in relation thereto. It is to be noted that the time for performance as found by the trial court had not arrived when the letter of termination of September 28th was written by the plaintiff, so that the breach, if any, which justified the plaintiff in terminating the contract was due to defendant's notice that it would be unable to commence deliveries before January 1, 1918, a postponement of three months. So far as the erection of the plant was concerned, there is no doubt that the defendant had substantially performed its contract within the meaning of that term as applied to building contracts. It was, however, not a part performance which had as yet conferred any other than a prospective benefit upon the plaintiff. The defendant was constructing the mill upon its own property and had the benefit of all additions thereto. The extent and character of the losses, if any, which had been suffered by the defendant (*Kauffman v. Raeder,* 108 Fed. 171, 177) is not clear from the record. There can be no question but that the making of the contract for the sale of the product was an inducement for the erection of the mill. It was an undertaking which was begun for the mutual benefit of the parties, and in a legal sense it must be said that the defendant suffered a substantial, material loss and was deprived of the benefits of the contract, which it had partially performed. The fact that the defendant had partially performed the contract on its part and the extent and character of the part performance are to be considered in connection with all other facts and circumstances in determining the materiality of the breach under the provisions of sec. 45. Such part performance might, in connection with other facts and circumstances, be very persuasive when so considered, even though it were held that it was not, standing alone, sufficient to bring the case within the rule laid down in *Kauffman v. Raeder, supra.*

It is to be noted further that the contract was to extend

over a long period of time and could not be terminated before July 1, 1921. Postponement was therefore approximately for one sixteenth of the minimum contract period. There can be no doubt but that the failure to deliver for three months would constitute a severable breach for which the plaintiff might be compensated in damages, which are readily ascertainable.

Upon the undisputed facts and the facts found by the trial court, we conclude that the trial court was in error in holding as a conclusion of law that the plaintiff was justified in refusing to proceed further by reason of the postponement of deliveries in accordance with the notice given by the defendant to the plaintiff in the letter of September 20, 1917. Taking into consideration the terms of the contract and all the circumstances of the case, we are of the opinion that the breach occasioned by the postponement of deliveries from September 9, 1917, to January 1, 1918, was not such a material breach of the contract as justified the plaintiff in refusing to proceed further and did not give to it a right of action for damages for breach of the entire contract.

· It appears from the evidence that plaintiff asserted by its letter of September 28, 1917, the right to terminate the contract under the provisions of sub. 2, sec. 1684$t$—45, and the controversy upon that aspect of the case as presented both in the trial court and here was rested mainly upon the provisions of that section, the plaintiff claiming that the breach was material and of such a character as authorized it to terminate the contract under the provisions of the section referred to, the defendant claiming that, on the grounds of excusable delay, performance was not due and that the breach complained of was not adequate to justify the plaintiff's termination of the contract. Assuming, as we do, that the plaintiff did not by that letter seek to rescind the contract, we call attention to some of the features of the contract which have not been fully argued here and are, we

think, worthy of consideration. Reference to paragraphs 10, 11, 12, and 13 makes it clear that the plaintiff was to furnish the raw materials out of which the chip board was to be made, the defendant having no right to purchase such material upon its own account except upon default of the plaintiff. The plaintiff agreed that it would purchase and have on hand for use under the contract up to 5,000 tons of such raw material, the raw material, however, to be paid for by the defendant. The language of the contract is:

"All raw materials purchased by second party [plaintiff] and shipped to first party [defendant] for manufacture of board under this contract shall be invoiced to first party by second party at air dry weights, with freight charges on such shipments allowed to Menasha, Wisconsin, at current market prices, and said first party [defendant] shall from time to time carry on hand and pay for up to five thousand tons of two thousand pounds each, of such raw material, and provide all needed storage room therefor."

And in the same paragraph the party of the second part [plaintiff] binds itself "to maintain a sufficient quantity of said clean raw materials required to insure the continuous operation of the mill of the first party [defendant] to its maximum capacity."

The contract relates to goods which are to be purchased by the plaintiff, paid for by the defendant, manufactured by the defendant, delivered by the defendant to the plaintiff in the manufactured form, at a stipulated price per ton. The contract is silent as to where the title to the goods bought by the plaintiff and paid for by the defendant is to be during the period of manufacture. Assuming it to be in the defendant, the question still remains whether or not the contract is one for the sale of goods within the meaning of that term as used in the Uniform Sales Act. Manifestly, the defendant could perform under the contract only by manufacturing goods from materials purchased for it by the plaintiff. It could not satisfy the calls of the contract by procuring

goods of the specified quality in the open market. The defendant did not agree to deliver a specified number of tons of chip board, but agreed to deliver the product of the mill to be erected by it, operating upon materials bought by the plaintiff to the amount of the capacity of the mill. We call attention to the questions suggested but shall not attempt a solution or further elaboration for the reason that if it should be held that the contract was not, strictly speaking, within the Uniform Sales Act, it becomes still more clear and certain that there was not such a default on the part of the defendant as would justify the plaintiff in terminating the contract as it did by its letter of September 28, 1917. The injury which the plaintiff would sustain by the failure of the defendant to commence performance prior to January 1, 1918, would be readily ascertainable and compensable in damages. Under such circumstances, the principles laid down in *Kauffman v. Raeder,* 108 Fed. 171, are applicable.

The plaintiff having unjustifiably terminated the contract by its letter of September 28, 1917, it has no right of action against the defendant for breach.

Our conclusion upon this question being decisive of the issues in the case for the reasons stated, we do not consider other questions presented.

*By the Court.*—The judgment of this court is set aside and the entry thereof vacated. Judgment of the circuit court is reversed, and the cause remanded with directions to dismiss the complaint.

Eschweiler, J., dissents.

Doerfler, J., took no part.